IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JOSEPH RAINES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 2:10-cv-1926-RBP-TMP |
| | ) |
| WARDEN DAVID WISE, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Joseph Raines, filed this *pro se* action pursuant to 42 U.S.C. § 1983, alleging that he has been deprived of rights, privileges, or immunities afforded him under the Constitution or laws of the United States of America during his incarceration at the St Clair Correctional Facility in Springville, Alabama. Named as defendants in the complaint are retired Warden David Wise; Captain Carl Sanders; ADOC Institutional Coordinator (Northern Division) Grant Culliver; Assistant Warden Joseph Headley; and Classification Supervisor Deborah Gardner. The plaintiff seeks compensatory damages and injunctive relief. In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(2), the complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136, 111 S. Ct. 1737, 114 L. Ed. 2d 194 (1991).

CASE HISTORY

On August 22, 2011, the court entered an Order for Special Report directing that copies of the complaint, as amended, (Doc. #1, #12, and #14) and the plaintiff's objections to the initial report and recommendation (Doc. #18) be forwarded to the defendants and requesting they file a special report addressing the plaintiff's factual allegations.[1] The parties were advised that the special report, if appropriate, might be considered as a motion for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.  On December 14, 2011, the defendants filed a special report accompanied by affidavits and copies of certain operation documents from the St. Clair Correctional Facility and the Alabama Department of Corrections. (Doc. #32).  An amended special report to include the affidavit of Warden Wise was submitted on January 4, 2012. (Doc. #36).  The plaintiff filed an "answer" to the defendant's special report on January 24, 2012. (Doc. #40).  On November 19, 2012, the parties were notified that the court would construe the defendants' special report as a motion for summary judgment and the plaintiff was notified that he would have twenty days to respond to the motion by filing affidavits or other material if he chose. The plaintiff was also advised of the consequences of any default or failure to comply with Fed. R. Civ. P. 56. *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).  The

---

[1] The order for special report was supplemented on September 19, 2011, (Doc. #24) by directing the defendants to also respond to the plaintiff's "Notice to the Court of Misunderstood Claims Pled." (Doc. #22).

plaintiff filed a "final response" to the defendants' motion for summary judgment on December 5, 2012. (Doc. #52). This matter is now before the court on the defendants' special report (Documents #32 and #36) being construed as a motion for summary judgment, and the plaintiff's responses thereto. (Documents #40 and #52).

## SUMMARY JUDGMENT STANDARD

Because the special report of the defendants is being considered a motion for summary judgment, the Court must determine whether the moving party, the defendants, are entitled to judgment as a matter of law. Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Federal Rule of Civil Procedure 56.* In making that assessment, the Court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted].  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof.  This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

## DISCUSSION

This is an action by a state inmate alleging violations of his due process, equal protection, and Eighth Amendment rights in connection with the closing of the Protective Custody Unit at the St. Clair Correctional Facility.  The plaintiff's claims were summarized in the Order for Special Report as follows:

> The plaintiff is an inmate currently housed at the St. Clair Correctional Facility.  He states that he has been in voluntary protective custody since September of 1998, because he believes he would not be safe in general

4

> population. Until July 12, 2010, when the protective custody unit at St. Clair
> was closed, the plaintiff was allowed most of the privileges enjoyed by the
> general population inmates, including daily showers and phone use, books,
> television and magazines and freedom of movement in the unit until nighttime
> lockdown. He complains that when the defendants closed the unit on July 12,
> he was not allowed to transfer to the protective custody unit at the Limestone
> Correctional Facility, as were two other protective custody inmates, but was
> re-classified to administrative segregation status at St. Clair, and lost the many
> of the privileges he enjoyed in protective custody. Now that he is housed in
> administrative segregation, the plaintiff is confined to his cell 23 and 1/4 hours
> per day, is only allowed to shower every other day, and allegedly has no access
> to books, television or movies. He also complains that he is handcuffed and
> manacled every time he comes out of his cell. The plaintiff contends that
> Alabama Department of Corrections regulations have created a liberty interest
> to which he is entitled to due process protection. He also contends that his
> transfer to the administrative segregation unit has violated his equal protection
> rights and amounts to cruel and unusual punishment, and therefore seeks
> injunctive relief in the form of an order requiring the defendants to reopen the
> St. Clair protective custody unit, or to transfer him to the protective custody
> unit at Limestone. He also seeks monetary damages of $24 per day "for each
> day spent in unconstitutional conditions."[2]

(Doc. #20, p. 3).

The defendants acknowledge that the protective custody unit at the St. Clair Correctional Facility was closed in July of 2010, "due to a Departmental need for additional single cell segregation beds." (Doc. #32-2). At the time, there were eight inmates housed in the unit, each of whom was screened by a review committee "for continued placement in a

---

[2] On September 8, 2011, the plaintiff submitted a pleading clarifying his claims by alleging that his reclassification to administrative segregation "was done without the due process hearing required in Administrative Regulation #435." (Doc. #22).

Protective Custody unit."[3] *Id*. and Doc. #32-1. However, only one of those inmates, Tory Singleton, was classified to continue in protective custody, while the remaining seven inmates, including the plaintiff, were classified as Medium Custody.[4] (Doc. #32-1). The reclassified inmates were each given the option to return to general population, but the plaintiff "refuses consideration for general population even at an enemy free facility," and instead has chosen to remain in administrative segregation, where he is "afforded all the rights, protection and privileges as any other inmate that is assigned to the [unit]." (Doc. #32-3).[5]

In response to the special report, the plaintiff argues that the "mandatory language in A.R. #435 conferred upon [him] a protected liberty interest in remaining in P.C. status," since the regulation allowed protective custody inmates to receive "most of the privileges bestowed on the general population." (Doc. #40, p. 3). He contends that the defendants violated his

---

[3] According to defendant Gardner, the plaintiff was served with a 24-hour notice of reclassification on July 12, 2010. (Doc. #32-4).

[4] Singleton, along with another inmate who was a former ABI agent, were transferred to the protective custody unit at the Limestone Correctional Facility. (Doc. #32-1). The defendants acknowledge that the plaintiff does have "validated enemy situations documented in his file," but maintain that he does not qualify for protective custody. (Doc. #32-2, p. 2).

[5] The plaintiff acknowledges that he has refused to go to general population, even at an enemy free facility, because he "doubt[s] the defendants can keep him free from assault and even death." (Doc. #40, p. 11). He justifies his refusal by arguing that he has "unknown enemies" within the prison population. *Id*. at 12. However, this statement is not only vague, but is not submitted under oath as required by Fed. R. Civ. P. 56. For this latter reason, it is not evidence that must be viewed favorably to the plaintiff.

6

constitutional rights by placing him in segregation without first holding a hearing because the "significant differences of confinement found between the Administrative Segregation Unit and the Protective Custody Unit" result in atypical and significant hardship, thereby creating a liberty interest protected by the due process clause. (Doc. #52).

The plaintiff also contends that his equal protection rights were violated because two other similarly situated inmates were allowed to transfer to the protective custody unit at Limestone.[6] (Doc. #40, p. 10). He argues that, like the other two inmates, he also meets the qualifications for protective custody, but was denied a transfer to the Limestone unit in order to "retaliate and punish" him for his refusal to go to general population. *Id*.

With respect to his Eighth Amendment claim, the plaintiff contends that he is being forced to endure "psychological pain" because of threats and verbal abuse by other inmates and "sometimes even by the other officers working the unit." (Doc. #40, p. 9). He alleges that the abuse is the result of the defendants having intentionally allowed the other inmates in the unit to find out that the he is a former protective custody inmate, and he submits copies of two Inmate Request slips purportedly sent to Captain Sanders complaining of verbal threats by other inmates, who resort to calling him a "snitch" and a "catch out" on a regular

---

[6] It is on this point that the plaintiff has submitted his only affidavit. He states that defendant Sanders' affidavit incorrectly identifies the second inmate transferred to Limestone Protective Custody as a former ABI agent, Grady Gibson, when in fact it was inmate Barry Sanderson. (Doc. #40, p. 21). He contends that Sanders named Gibson, "instead of a regular inmate," in order to "conceal the defendants' discriminatory intentions towards [me]." *Id*.

basis. *Id*. at 9 and 18-19.  He states that his treatment in the unit has caused him to suffer depression, insomnia, and nightmares. *Id*. at 9.

**Due Process claim:**

An inmate may claim the protection of the due process clause only if the state deprives him of a property or liberty interest that is a legal entitlement under state or federal law. *Meachum v. Fano*, 427 U.S. 215 (1976).  "But given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Id.* at 224.  Therefore, "[t]he transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983).  In fact, because administrative segregation "may be used to protect [a] prisoner's safety, to protect other inmates from a particular prisoner, to break up potentially disruptive groups of inmates, or simply to await later classification or transfer," it "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Id*.  Absent a state statute or regulation to the contrary, "a prisoner has no protected liberty interest in being confined in the general prison population

8

rather than in restrictive segregation." *Meriwether v. Faulkner*, 821 F.2d 408, 414 (7th Cir.), *cert. denied*, 484 U.S. 935 (1987).[7]

Prior to the Supreme Court's holding in *Sandin v. Conner*, 515 U.S. 472, caselaw "employed a methodology for identifying state-created liberty interests that emphasized the language of a particular [prison] regulation instead of the nature of the deprivation." *Wilkinson v. Austin*, 545 U.S. 209, 222 (2005); *quoting Sandin*, 515 U.S. at 481 (internal quotations omitted). However, this approach was criticized in *Sandin* for "creating a disincentive for States to promulgate procedures for prison management" and for "involving the federal courts in the day-to-day management of prisons." *Id*.[8] Therefore, the *Sandin* decision "abrogated the methodology of parsing the language of particular regulations" and instead requires the courts to examine restrictive prison conditions as they relate "to the ordinary incidents of prison life." *Id*. at 222-23.[9] In other words, even in the face of

---

[7] "There is no constitutionally protected liberty interest in being housed in a certain prison or a certain section within a prison." *Sanchez v. McCay*, 349 Fed. Appx. 479, 480 (11th Cir. 2009); *citing Meachum v. Fano*, 427 U.S. 215, 224 (1976). It therefore seems clear that a prisoner has no inherent constitutional right to protective custody. *Mozee v. Crowley*, 188 Fed. Appx. 241, 242 (5th Cir. 2006); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994); *Jolly v. Van Peavy*, 2012 WL 4829269 at *3 (M.D. Ga. August 30, 2012).

[8] In *Sandin*, the Supreme Court recognized that allowing the focus of a liberty interest inquiry to be based upon the language of a particular regulation, rather than the nature of the deprivation, created the undesirable affect of "encourag[ing] prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." 515 U.S. at 481.

[9] "After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of

9

favorable regulatory or statutory language, a convicted prisoner will not be entitled to due process protection unless he is also subjected to restrictive conditions which impose "atypical and significant hardship." *Sandin*, 515 U.S. at 484.

The plaintiff argues incorrectly that the language of certain ADOC and St. Clair Correctional Facility regulations have created a liberty interest which requires that he be afforded due process before being placed in administrative segregation. In support of this contention, he cites section D of Part V of ADOC Regulation #435 which requires that an inmate who requests release from protective custody be given a due process hearing in the event the Warden or his designee determine that the inmate cannot be released into the general prison population but must instead be placed in administrative segregation. (Doc. #40, p. 2; Doc. #32-6, p. 8). However, this particular portion of the regulation deals with the opposite of the situation in this matter. Here, the plaintiff has not sought release from protective custody, but seeks to be classified as a protective custody inmate, and has remained in administrative segregation voluntarily due to his fear that prison officials cannot

---

regulations regarding those conditions but the nature of those conditions themselves in relation to the ordinary incidents of prison life." *Wilkinson*, 545 U.S. at 223 (internal quotations omitted); *see also Smith v. Regional Director of Florida Department of Corrections*, 368 Fed. Appx. 9, 13 (11th Cir. 2010).

protect him in the general prison population.[10]  Therefore, the particular portion of the regulation cited by the plaintiff is not applicable to the fact situation before the court.[11]

To the extent the plaintiff argues that the regulations create a liberty or property interest in *remaining* in protective custody, his claim is without merit.  Not only are the regulations couched in discretionary terms with respect to the placement of inmates in protective custody,[12] but it is clear that such an approach is no longer viable after the Supreme Court's ruling in *Sandin*.  In other words, the language in a state statute or regulation will not *alone* create a liberty interest entitling prisoners to due process protection.  Instead, the key question becomes whether the plaintiff's removal from protective custody and placement in segregation results in a "dramatic departure" from the basic conditions

---

[10] It is undisputed that administrative segregation is not the plaintiff's only option, and that his "reclassification paperwork" allows him to be considered for transfer to the general population "at a facility which meets his security level [and] is noted to be enemy free." (Doc. #32-2, p. 2). However, it is also undisputed that the plaintiff has refused to be placed in general population, even at an "enemy free" facility. (Doc. #40, p. 11; Doc. #32-3).

[11] Even if the particular regulation was applicable to the plaintiff's situation, he could not assert a claim under § 1983 based solely on the fact that prison officials violated the regulation.  The mere fact that agency regulations or procedures have not been followed does not alone raise a constitutional issue.  *U.S. v. Caceres*, 440 U.S. 741, 751-52 (1979); *Magluta v. Samples*, 375 F.3d 1269, 1279 n. 7 (11th Cir. 2004).

[12] ADOC Administrative Regulation #435 states that the warden or his designee *may* place an inmate in protective custody. (Doc. #32-6, p. 3).  Likewise, the St. Clair Correctional Facility Standard Operating Procedure #171 places no limit on the discretion of the warden or his designee to determine "whether the reasons for the protective custody request are fully justified." (Doc. #32-5, p. 3).  When a statute or regulation is framed in discretionary terms, no liberty interest is created. *Hartley v. Warden of Florida State Prison*, 352 Fed. Appx. 368, 369 (11th Cir. 2009); *citing Francis v. Fox*, 838 F.2d 1147, 1149 (11th Cir. 1988).

within the Alabama penal system.  If it does not, and if the conditions do not otherwise violate the Constitution, the plaintiff's complaint is without merit.

In this instance, the plaintiff complains that he is being held in administrative segregation at St. Clair instead of being transferred to the protective custody unit at the Limestone Correctional Facility.  He complains that the conditions in segregation are much more restrictive than those that are found within the protective custody unit at Limestone or within the general prison population.  However, as stated above, our courts have consistently held that the transfer of a prisoner to more restrictive quarters is "well within the terms of confinement ordinarily contemplated by a prison sentence," and that administrative segregation is the type of confinement that inmates should "reasonably anticipate" during the course of their sentence.  *Hewitt*, supra.[13]  It is therefore clear that an inmate's placement in segregation is not an atypical or significant hardship or a dramatic departure from ordinary prison life.[14]

---

[13] The plaintiff's refusal to go to general population provides further evidence that the conditions in the segregation unit do not constitute a significant departure from normal prison life. The Supreme Court in *Sandin*, noting that the plaintiff there had indicated "a personal preference for the quietude of the SHU," indicated that a prisoner's voluntary entry into more restrictive quarters has at least some bearing on the issue of whether the conditions therein are an atypical and significant hardship.  The Court stated that "[a]lthough we do not think a prisoner's subjective expectation is dispositive of the liberty interest analysis, it does provide some evidence that the conditions suffered were expected within the contour of the actual sentence imposed." 515 U.S. at 486 n. 9.  *See also Walker v. Paciorek*, 70 F.3d 1275, 1995 WL 695951 at *2 (7th Cir. 1995) (table).

[14] *See Pichardo v. Kinker*, 73 F.3d 612, 613 (5th Cir. 1996) ("[A]bsent extraordinary circumstances, administrative segregation as such, being an incident to the ordinary life as a prisoner, will never be a ground for a constitutional claim.").  In this case, although the plaintiff describes

12

More importantly, the plaintiff's due process claim fails for the additional reason that his presence in administrative segregation is voluntary at this point. In order to assert a procedural due process claim, the plaintiff "must establish that: (1) he was *deprived* of a constitutionally protected liberty or property interest, (2) *through state action*, and (3) he was not provided with a constitutionally adequate process to contest the deprivation." *Thorne v. Chairperson Florida Parole Com'n.*, 427 Fed. Appx. 765, 771 (11th Cir. 2011) (emphasis added); *citing Arrington v. Helms*, 438 F.3d 1336, 1347 (11th Cir. 2006). Therefore, even assuming *arguendo* that a prisoner would normally be entitled to procedural due process protection before any transfer to administrative segregation, it seems clear that a prisoner has not been "deprived" of a liberty interest by "state action" if he *voluntarily* placed himself in the segregation unit in lieu of an option to return to general population. *See Rademakers v. Scott*, 350 Fed.Appx. 408, 412 (11th Cir. 2009) (because employee "resigned of her own free will ... she relinquished her liberty interest voluntarily and thus cannot establish that [defendant] 'deprived' her of it within the meaning of the due process clause"); *Moorer v. City of Montgomery*, 293 Fed.Appx. 684, 690 (11th Cir. 2008) ("the state does not deprive a plaintiff of his property interest in a job if the plaintiff voluntarily resigns"); *L.L. Nelson Enterprises, Inc., v. County of St. Louis, Mo.*, 637 F.3d 799, 806 (8th Cir. 2012) ("When a

---

living conditions which are more restrictive than those in general population or protective custody, including the loss of some privileges afforded general population and protective custody inmates, he has not described conditions that are "atypical" to prison life or which impose a "significant hardship" in relation to the conditions within the Alabama penal system.

13

person voluntarily surrenders liberty or property, the State has not *deprived* the person of a constitutionally-protected interest"). In this instance, it is undisputed that the plaintiff remains in administrative segregation because of his refusal to go to the general prison population, even at an enemy free facility. He therefore has not been deprived of a liberty interest as a result of any action state action.

**Equal Protection:**

Although prisoners do not surrender equal protection rights at the prison gate, the equal protection clause only applies if the groups being compared are similarly situated. In order to assert a valid equal protection claim, the plaintiff must demonstrate that he is similarly situated with other prisoners who received more favorable treatment *and* that the alleged discriminatory treatment was based on some constitutionally protected interest such as race. *Jones v. Ray*, 279 F.3d 944 (11th Cir. 2001). In this case, it is undisputed that the inmates who formerly resided in the dissolved St. Clair protective custody unit were screened by a review committee to determine if they qualified for transfer to the Limestone protective custody unit. Although there is an issue of fact with respect to the identity of one of the inmates allowed to transfer, the plaintiff has submitted no specific facts which would support an equal protection challenge to his treatment by prison officials. He states in conclusory fashion that the other inmates who were allowed to transfer were in the "same situation" as

he, but he fails to provide specific facts to support that conclusion, nor does he show how his treatment was the result of a constitutionally discriminatory purpose.[15] An equal protection challenge to governmental action is limited to instances of purposeful or intentional discrimination rather than erroneous or even arbitrary administration of authority. *See Snowden v. Hughes*, 321 U.S. 1, 8 (1944). "Absent any allegation of a discriminatory purpose, a mere failure of those who administer the law to treat equally all persons who violate the law does not constitute a denial of the constitutional right to equal protection." *Harrington v. United States*, 673 F.2d 7, 11 (1st Cir. 1982) (citations omitted). *See also E & T Realty v. Strickland*, 830 F.2d 1107 (11th Cir. 1987), *cert. denied*, 485 U.S. 961 (1988).

**Conditions of Confinement:**

Other than the plaintiff's sworn complaint and the conclusory statement by defendant Culliver that the plaintiff's placement in segregation "did not create a situation of cruel and unusual punishment," neither the plaintiff nor the defendants have addressed the conditions of confinement issue with sworn testimony. This matter therefore remains in the same posture as it was at the initial report and recommendation stage. For the reasons set forth in

---

[15] His assertion that the failure to transfer him to protective custody was the result of "retaliation and punishment" is conclusory and wholly unsupported by admissible facts. Furthermore, in an earlier pleading the plaintiff acknowledged that he "would only be speculating if he were to give any discriminatory reason for the defendants' failure to treat [him] in an equal way as inmates Sanderson and Singleton." (Doc. #18, p. 6).

15

the initial report and recommendation (Doc. #17), the magistrate judge finds the plaintiff has failed to assert a valid Eighth Amendment claim.

Although not presented in a form sufficient to satisfy Rule 56, the plaintiff in his response to the special report has asserted the additional claim that he has suffered psychological damage as a result of the threats and taunting he receives in the segregation unit. Even if this issue had been presented by way of admissible testimony, the plaintiff's claim would be without merit. The mere allegation that prison officials exposed a prisoner to the risk of violence from other prisoners does not usually implicate the Eighth Amendment's Cruel and Unusual Punishments Clause. *Doe v. Welborn*, 110 F.3d 520 (7th Cir. 1997). "It is the reasonably preventable assault itself, rather than any fear of assault, that gives rise to a compensable claim under the Eighth Amendment." *Id*. at 524. Although the Eighth Amendment does not completely preclude conditions-of-confinement type claims based solely on allegations of psychological injury, those instances must involve psychological injury that amounts to a deprivation of the "minimal civilized measures of life's necessities" in order to state a cognizable claim. *Id*. at 524. *See also Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 2324, 115 L. Ed. 2d 271 (1991); *Jordan v. Doe*, 38 F.3d 1559, 1564 (11th Cir. 1994); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The plaintiff's allegations do not meet this strict burden.

Additionally, because the plaintiff is still a prisoner, his complaint is governed by the provisions of the Prison Litigation Reform Act. Under that Act, "[n]o Federal civil action may be brought by a prisoner in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C.A. § 1997e(e). In that regard, the Eleventh Circuit has held that the alleged injury must be more than *de minimis* in order to satisfy the requirements of § 1997e(e). *Harris v. Garner*, 190 F.3d 1279 (11th Cir. 1999), rehearing granted, opinion vacated 197 F.3d 1059, opinion reinstated in part on rehearing 216 F.3d 970, certiorari denied 121 S. Ct. 2214, 532 U.S. 1065, 150 L. Ed. 2d 208. In this instance, the plaintiff has alleged no physical injury in connection with his having been placed administrative segregation and any claim for mental or emotional injury is therefore barred by the above statute.

### **RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT**

Accordingly, for the reasons stated above, the magistrate judge RECOMMENDS that the defendants' special report be treated as a motion for summary judgment and, as such, that it be **GRANTED** and this action **DISMISSED WITH PREJUDICE**.

Any party may file specific written objections to this report and recommendation within fifteen (15) days from the date it is filed in the office of the Clerk. Written objections shall specifically identify the portions of the proposed findings and recommendation to which

objection is made and the specific basis for objection. Objections not meeting this specificity requirement will not be considered by a district judge. A copy of the objections must be served upon all other parties to the action. Frivolous, conclusive, or general objections will not be considered by the District Court. Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fifteen (15) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal except upon grounds of plain error or manifest injustice.

A party may not appeal a magistrate judge's recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a district judge.

The Clerk is **DIRECTED** to serve a copy of this report and recommendation upon the plaintiff and upon counsel for the defendants.

DONE this the 16th day of July , 2013.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE